**COURT OF APPEALS
DECISION
DATED AND FILED**

**August 19, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2022AP802**

**STATE OF WISCONSIN**

Cir. Ct. No. 2020TP204

**IN COURT OF APPEALS
DISTRICT I**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO S.R., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

  V.

J. D. R., SR.,

      RESPONDENT-APPELLANT.

      APPEAL from an order of the circuit court for Milwaukee County: ELLEN R. BROSTROM, Judge. *Affirmed.*

¶1    DUGAN, J.[1] Jacob appeals an order of the trial court terminating his parental rights to his son.[2] On appeal, he argues that the evidence introduced at his grounds trial was insufficient to support the jury's verdicts. He also argues that the trial court erroneously exercised its discretion at the disposition hearing when it weighed the factors and terminated his rights. Upon review, this court affirms.

## BACKGROUND

¶2    Jacob's son, Shawn, was born prematurely in August 2017 to Jacob and Lauren. As a result of Lauren's substance abuse, Shawn tested positive for both cocaine and marijuana at the time of his birth. A home safety plan was immediately put into place for Shawn by the Division of Milwaukee Child Protective Services' (DMCPS) under which Jacob was not to leave Shawn unsupervised with Lauren for any period of time and to make alternate care arrangements with Jacob's sister—Shawn's aunt—if Jacob was not able to care for Shawn. The home safety plan failed—DMCPS observed Shawn unsupervised with Lauren, and Shawn was removed from the parental home in January 2018.[3] Shawn has been living outside of the parental home since his removal in January 2018.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] For ease of reference and to maintain the confidentiality of these proceedings, this court uses pseudonyms to refer to the individuals in these proceedings.

[3] While DMCPS suspected multiple violations of the home safety plan, the plan finally ended when Jacob suffered "a personal health crisis" and DMCPS confirmed that Shawn was left in Lauren's care.

¶3      The State filed a petition to terminate Jacob's parental rights on September 18, 2020.[4]  As grounds, the State alleged that Shawn was a child in continuing need of protection or services (continuing CHIPS) and that Jacob failed to assume parental responsibility.  Jacob contested the allegations in the petition, and the case proceeded to a jury trial on the grounds phase.

¶4      At the jury trial in December 2021, the jury heard testimony from several witnesses, including several of the case managers and Jacob.  The case managers testified that Jacob continued a relationship with Lauren for several years, failed to identify and protect Shawn from the dangers present in the home related to Lauren's drug usage, and left Shawn unsupervised with Lauren in violation of the home safety plan.  The case managers further testified that Jacob repeatedly denied the presence of a convicted sex offender living in his home, and that Jacob failed to recognize the danger that this individual's presence posed to Shawn.[5]

---

[4] The petition also sought to terminate the mother's rights.  Her rights are not at issue in this appeal.

Additionally, as the trial court later recognized at the disposition hearing, the State delayed filing the termination of parental rights action and requested an exception to the deadlines for filing the petition "hoping that somehow … this family could be put back together."

[5] As further described in detail at the disposition hearing, an older son of Jacob and Lauren had sexually assaulted one of his younger sisters—also a daughter of Jacob and Lauren— on multiple occasions at the family home.  Court records introduced at the disposition hearing indicated that Jacob's older son was fifteen years old at the time of the assaults, and Jacob's daughter was twelve or thirteen years old.  Additionally, the daughter reported the assaults to her parents, but neither Jacob nor Lauren acted on her reports.  In fact, Jacob indicated that he responded by shooting his older son with a BB gun.

(continued)

¶5      Additionally, the case managers testified that Jacob participated in visitation with Shawn, but he often failed to arrange for activities to do during the visits and sometimes the visits ended early as a result of a lack of activities and supplies for the visits.

¶6      The case managers further testified that Jacob was generally unwilling to participate in many of the services offered to him and often missed or rescheduled appointments and generally failed to complete the services. On the other hand, the case managers did recognize that Jacob made progress in meeting select conditions for Shawn's return by participating in parenting classes and therapy to learn to control his temper, but Jacob had not ultimately made the necessary progress to meet the conditions. Overall, the case managers testified that there were still ongoing concerns with Jacob's anger and his temper leading to inappropriate discipline and behavioral expectations that were not age appropriate, and there were concerns regarding the safety of the home. Thus, Jacob had not met the conditions for Shawn's return, which required Jacob to provide a safe home for Shawn, control his emotions, supervise Shawn, and put Shawn's needs above his own.

¶7      Jacob testified that he had been involved with Shawn's prenatal care and had provided for Shawn's daily needs from the time Shawn was born until the time Shawn was removed from the home. Jacob further testified that he had

---

The case manager testified that Jacob indicated that his older son was not living at his home, but the case manager observed that both Jacob's older son and his daughter were present in the home as recently as August 2021. The case manager observed the older son in the home, along with signs that he was living in the basement, and she also found that Jacob's son had provided the address of the family home to his probation agent and Jacob's address was listed in court records as the son's address.

regular visits with Shawn and would bring food and other items to the visits. He also testified that he participated in several of the services that his case managers offered to him and that he was making progress in controlling his anger, exercising appropriate discipline, and having age appropriate expectations for Shawn.

¶8 Jacob denied that Lauren had unsupervised contact with Shawn, and he testified that the only time Lauren had unsupervised contact was the time that Shawn was removed from the home. He explained that he was suffering from a medical emergency at the time and Lauren was the only person available to care for Shawn on such short notice. Jacob further denied that there was ever anyone in the house that was not supposed to be there and there was never an unsafe individual in the home. He also testified that he ended his relationship with Lauren in October 2021.

¶9 In the end, the jury found that the State had proved both the continuing CHIPS and the failure to assume parental responsibility grounds. The trial court subsequently found Jacob to be an unfit parent, and the case proceeded to the disposition hearing.

¶10 At the disposition hearing, Shawn's foster mother, the current case manager, and Jacob testified.[6] The foster mother testified that Shawn's health had improved since he had been in her care and that he looked to her for comfort and his daily needs. She further testified that she would adopt Shawn if Jacob's parental rights were terminated; however, she was also committed to maintaining a

---

[6] The disposition hearing also included testimony related to the termination of Lauren's parental rights to Shawn's half-sister. Shawn's half-sister is not the subject of this appeal, and as previously stated, Lauren's parental rights are not at issue in this appeal.

relationship with Jacob because she had a good "co-parenting" relationship with him and believed it was in Shawn's best interest to continue contact with Jacob. Accordingly, she also testified that Shawn calls her and her husband by their first names and Shawn knows Jacob and Lauren as mom and dad. As to other family members, the foster mother testified that Shawn had little to no contact with his siblings, and she was not aware of any contact that Shawn had with extended family members.

¶11 The case manager testified that Shawn was doing well in his current placement, that the foster family currently meets all of Shawn's needs, and that she believed it was in Shawn's best interests that Jacob's parental rights be terminated. As to family members, the case manager testified that Shawn "recognizes" his siblings, but that any harm of severing the legal relationship with his siblings would be short term.

¶12 The case manager also provided extensive testimony detailing the sexual assault case involving one of Jacob's older sons—the convicted sex offender referenced at the grounds trial—and testified that she saw him at Jacob's house, along with signs that he was living in the basement of Jacob's house. The case manager further testified that, while Jacob generally denied that his older son was living in the basement, she spoke to the son's probation agent, and the probation agent indicated to her that Jacob's older son had provided Jacob's address as his residence.[7] The case manager further detailed that she observed a

---

[7] During the grounds trial another case manager testified that she visited Jacob's residence in August 2021, to assess it for safety. In the basement, she saw sheets hanging from the ceiling and Jacob's older son, who was a convicted sex offender, pulled a sheet back and walked out. She saw a bed behind the sheets. During a second visit to the residence in October 2021, she again went into the basement and saw a bed, a table with a TV and toiletries on it, marijuana and a "mask" for inhaling marijuana.

bedroom for Jacob's daughter—the victim of the older son's sexual assaults—in the same house, and one of Jacob's other sons told a prior case manager that the older son was living in the house.

¶13 By contrast, Jacob testified that his family was very close knit and Shawn was bonded with his brothers and sisters. He described that he arranged outings to places such as Chuck E. Cheese with Shawn and his other siblings in order that Shawn would be able to know his other siblings, and he believed Shawn was bonded to his siblings. He also testified that he saw himself as the one keeping his family together, that he had FaceTime calls with Shawn regularly, and that he provided for Shawn's needs by providing him clothes and shoes. He further testified that he has been continuing parenting classes and has learned to control his temper and to talk about his problems. He also explained that Lauren and his older son no longer lived with him and were not allowed in his home.[8]

¶14 The trial court ultimately terminated Jacob's parental rights. In evaluating the factors to be applied at the disposition hearing, the trial court began by recognizing that there have been allegations that Jacob had engaged in inappropriate discipline of the children but that this case has never been about Jacob being abusive. Instead, the trial court characterized this case as one of "addiction" and "what addiction has brought into this family." The trial court stated that Jacob "has a very strong dedication to keeping his family together," and the trial court continued that it wanted to recognize that Jacob clearly loved Lauren and was devoted to her. Overall, the trial court stated that it was

---

[8] On cross-examination, Jacob did testify, however, that he had a FaceTime call with Shawn at Thanksgiving, and his older son, as well as several of his other children, could be seen in the background. Jacob's explanation was that it was not his house.

"respectful of the good qualities and the challenges of these parents" that made this case "really a hard case."

¶15   However, the trial court continued that Lauren was really a danger to these kids, and Jacob "didn't appear to be protective" because he often seemed unaware of Lauren's drug usage and "not gathering and understanding the gravity of the circumstances." Moreover, the trial court stated that Jacob failed again at being a protective parent during the situation with his older son and allowing his son to live in his home with the sister that he sexually assaulted, as well as have regular access to the rest of Jacob's young children. Thus, the trial court found that Jacob's testimony was not credible: "[Jacob] testified that I should believe he can manage all of this and be protective, but that hasn't been what he has demonstrated."

¶16   Overall, the trial court found that it was in Shawn's best interests to terminate Jacob's parental rights. The trial court noted that Shawn had now been placed outside of Jacob's home for four years, which accounts for the majority of Shawn's life; that Shawn was thriving in his current placement; and that Shawn's current placement was an adoptive resource. Because of Shawn's age, the trial court placed little weight on the factor looking at the wishes of the child, and because Shawn had been placed outside the parental home for the majority of his life, the trial court found that it was hard to gauge the nature of his relationship with Jacob. However, the trial court stated that the foster family was dedicated to doing what was in Shawn's best interests and that the harm of terminating Jacob's parental rights would be mitigated by the foster family's "dedication in continuing contact." The trial court also found that, "most fundamentally," Shawn needed stability and permanence, and termination of Jacob's rights would provide that.

¶17    Jacob now appeals.

## DISCUSSION

### I.    Sufficiency of the Evidence to Sustain the Jury's Verdict

¶18    On appeal, Jacob argues that the evidence was insufficient to prove the grounds alleged in the TPR petition.[9]  "A jury's verdict must be sustained if there is any credible evidence, when viewed in a light most favorable to the verdict, to support it."  **Sheboygan Cnty. DHHS v. Tanya M.B.**, 2010 WI 55, ¶49, 325 Wis. 2d 524, 785 N.W.2d 369.  In this case, the State alleged both continuing CHIPS and failure to assume parental responsibility grounds in the TPR petition, and therefore, this court addresses whether there was sufficient evidence to support the jury's verdicts as to these two grounds.

#### A.  Continuing CHIPS

¶19    For the continuing CHIPS grounds, the State was required to prove that Shawn was a child in need of protection or services under a relevant court order containing a notice of termination of parental rights, that DMCPS made a reasonable effort to provide services to Jacob to meet the court-ordered conditions for Shawn's return, and that Jacob failed to meet the conditions for Shawn's return.  *See* WIS. STAT. § 48.415(2)(a).

---

[9] In his brief, Jacob asserts that the trial court's finding that Jacob was an unfit parent was clearly erroneous and that the trial court had a duty to find grounds by clear and convincing evidence.  This misstates the applicable standard.  Rather, the trial court is required to find Jacob to be an unfit parent following a jury verdict that the State proved the grounds, and it was the jury's task here to find whether there was clear and convincing evidence to prove the grounds alleged in the petition.  *See* WIS. STAT. § 48.424(3), (4).

¶20 Jacob's argument on appeal focuses on his own favorable testimony about his efforts to make positive changes in his life to meet the conditions for Shawn's return, and he argues that, considering the testimony he gave about his progress to meet the conditions of Shawn's return, there was insufficient evidence to support a finding that he had not met the conditions. Specifically, he points to his testimony that he was taking parenting classes to learn how to manage Shawn's tantrums and control his own anger, that he was involved in counseling to learn to deal with his anger, and that he was exercising his role as a protective parent by protecting Shawn from Lauren and other individuals who might be unsafe. However, considering the testimony from the grounds trial as a whole, specifically the testimony given by the case managers, there is sufficient credible evidence to support a finding that Jacob failed to meet the conditions of return.

¶21 As described at the grounds hearing, Jacob was required to meet several conditions for Shawn's return including: always supervise Shawn and place Shawn's needs above his own, have age appropriate expectations of Shawn, control his emotions, keep a safe and clean home, provide safe care for Shawn, and visit with Shawn regularly. In contrast to the positive testimony Jacob gave about his progress in meeting these conditions for Shawn's return, the case managers testified that Jacob generally failed to complete these conditions.

¶22 The case managers testified that Jacob was "minimally" involved in the services provided to him and cancelled or rescheduled several appointments with the services that the case managers tried to provide. Also, while Jacob had participated in some parenting classes and therapy to make some progress in fulfilling certain conditions that required him to control his emotions, Jacob generally failed to complete these conditions for Shawn's return. Specifically, despite some of the parenting courses and therapy Jacob participated in, there were

still concerns about Jacob's anger leading to inappropriate discipline and behavioral expectations of Shawn, and with one of the conditions for Shawn's return being that Jacob control his anger, this condition was not satisfied. In fact, one of the case managers testified that Jacob would scream and swear at him on the phone. Additionally, Jacob also refused to participate in family therapy with Shawn that was recommended by one of the other case managers.

¶23 To meet the conditions of Shawn's return, Jacob was also required to provide a safe and clean home for Shawn, supervise Shawn, and place Shawn's needs above his own. However, as the case managers testified, there were ongoing concerns with Jacob being able to fulfill his role as a protective parent and provide a safe living environment for Shawn, given that Jacob continued his relationship with Lauren, exposed Shawn to drug use, and there was evidence that Jacob's older son, a convicted sex offender, was living in the home.

¶24 As one of the case managers testified, there was drug paraphernalia—including a gas mask—in the basement of Jacob's home, along with a bedroom in the basement of Jacob's home for his older son. As cause for additional concern, Jacob continually denied his son's presence in his home and was not forthright with his case managers regarding details of who was in his home. In fact, one of the case managers testified that she researched court records regarding the sexual assault case and reached out to Jacob's son's probation agent in order to obtain details. However, when Jacob discovered that the case manager did this, she testified that Jacob screamed at her.

¶25 The jury also heard that Jacob participated in visits with Shawn, but the jury also heard from the case managers that Jacob was unprepared for these visits, which caused the visits to end early. In fact, there was a period of time

when Jacob moved from unsupervised to supervised visits that Jacob refused to visit with Shawn unless the visits moved back to being unsupervised. There was also testimony that Jacob would attend the visits with Lauren, but he would require Lauren to provide the food and other supplies, sometimes even having her leave during the visit to go to the store, while Jacob remained at the visitation center. There was also concern with the amount of time that Jacob spent on his phone during visits and entertaining Shawn with the phone, instead of the two playing and interacting with one another. As part of the conditions of return, Jacob was required to have regular visits with Shawn, but he was also required to bring activities to the visits, engage with Shawn, and make use of the entire visit as one of his conditions for Shawn's return.

¶26     Examining the testimony as a whole, this court concludes that there was sufficient evidence at the grounds hearing to support a finding that Jacob failed to meet the conditions for Shawn's return and thus a finding of the continuing CHIPS grounds.

### B. Failure to Assume Parental Responsibility

¶27     As to the failure to assume parental responsibility ground, the State was required to prove that Jacob did not have "a substantial parental relationship" with Shawn. *See* WIS. STAT. § 48.415(6)(a). A substantial parental relationship within the meaning of the statute "means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child." Sec. 48.415(6)(b). Factors to be considered in evaluating whether a parent has a substantial parental relationship with a child include:

> whether the person has expressed concern for or interest in the support, care or well-being of the child, whether the person has neglected or refused to provide care or support

> for the child and whether, with respect to a person who is or may be the father of the child, the person has expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.

*Id.*

¶28 Here, Jacob argues that his testimony establishes that the evidence was insufficient to support a finding that he failed to establish a substantial parental relationship with Shawn. Specifically, he relies on his testimony about his involvement in Shawn's first few months of life and his current visitation with Shawn, and he argues that this demonstrates that he established a substantial parental relationship with Shawn.

¶29 While Jacob's testimony does support that he was involved in Lauren's prenatal care and was involved in caring for Shawn on a daily basis for the first few months of Shawn's life, the case managers also provided extensive testimony that Shawn has been living outside Jacob's home for the majority of his life, and that Shawn's foster family had cared for Shawn on a daily basis and provided for Shawn's daily needs, including food, clothing, medical care, education, and comfort. In fact, Jacob himself acknowledged during his testimony that someone else had been providing for Shawn's daily needs since Shawn was removed from his care.

¶30 The case managers also testified that, despite Jacob's visitation with Shawn, Jacob failed to inquire about Shawn and failed to involve himself with Shawn's daily activities and medical care. Indeed, as one example of Jacob's lack of involvement, Jacob was unable to recall the name of Shawn's daycare. Jacob also testified that Shawn was doing well in daycare, but the case managers testified to the contrary, saying that Shawn often had tantrums and "red card" days

13

to the point where his foster mother was worried he would be kicked out of daycare.

¶31    The case managers further testified that Jacob generally did not provide Shawn with any clothes, and while Jacob had offered at one point to buy Shawn a pair of shoes, Jacob still had not followed through with his offer.

¶32    Thus, this court concludes that there was sufficient evidence introduced at the grounds trial to support the jury's verdict that Jacob failed to assume parental responsibility.  The testimony from the case managers shows that Jacob failed to accept or exercise responsibility for Shawn's daily supervision, education, protection, and care by, among other things, failing to express concern for or an interest in Shawn and by failing to provide care or support for Shawn.

¶33    In sum, this court concludes that the evidence was sufficient to support the jury's verdicts at the grounds phase.  In reaching this conclusion, this court observes that in making his argument that the evidence was insufficient, Jacob simply isolates his own testimony from the rest of the testimony that the jury heard during the trial from the case managers, and requests that this court conclude that the evidence was insufficient based on his testimony alone.  As the guardian ad litem (GAL) notes, Jacob points to only the "positive testimony coming from his own time on the stand."  Applying the proper standard—"A jury's verdict must be sustained if there is *any* credible evidence, when viewed in a light most favorable to the verdict, to support it."—this court must assess the evidence introduced at trial as whole—not just simply Jacob's own self-serving testimony.  *See Tanya M.B.*, 325 Wis. 2d 524, ¶49 (emphasis added).  In so doing, it is clear that the jury heard sufficient evidence to support the verdicts rendered.

### II.     Trial Court's Decision

¶34    Jacob additionally argues that the trial court erroneously exercised its discretion at the disposition hearing, and he contends that the trial court's weighing of the factors was erroneous because the trial court placed excessive emphasis on irrelevant facts. This court again disagrees.

¶35    "The ultimate determination of whether to terminate parental rights is discretionary with the circuit court." *State v. Margaret H.*, 2000 WI 42, ¶27, 234 Wis. 2d 606, 610 N.W.2d 475. Consequently, the weighing of the factors at the disposition hearing is within the trial court's discretion, and this court "will sustain the circuit court's ultimate determination in a proceeding to terminate parental rights if there is a proper exercise of discretion." *Id.*, ¶32. "A proper exercise of discretion requires the circuit court to apply the correct standard of law to the facts at hand." *Id.*

¶36    "At the dispositional hearing, the court must consider any agency report submitted and the six factors enumerated in [WIS. STAT.] § 48.426(3) in determining the best interests of the child." *Sheboygan Cnty. DHHS v. Julie A.B.*, 2002 WI 95, ¶4, 255 Wis. 2d 170, 648 N.W.2d 402. The factors listed in § 48.426(3) are:

> (a) The likelihood of the child's adoption after termination.
>
> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever those relationships.
>
> (d) The wishes of the child.

(e) The duration of the separation of the parent from the child.

(f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's placement, the likelihood of future placements and the results of prior placements.

In this case, a review of the record, demonstrates that the trial court applied the correct standard of law to the facts of this case.

¶37 The trial court indicated that the driving force behind its decision in the disposition phase was the best interests of the child, it listed the factors found in WIS. STAT. § 48.426(3), and it provided an analysis of the facts as it related to the factors and which factors were significant for this case. As to the first two factors, the trial court found that Shawn was likely to be adopted by his current foster family, where Shawn was currently thriving and where his health had improved since being removed from the parental home. The trial court also found in regards to the third factor that Shawn did not have substantial relationships with any of his siblings or extended family because Shawn saw them infrequently. The trial court further found that it was hard to gauge any substantial relationship between Jacob and Shawn because Shawn had been removed from the parental home just months after his birth. However, the trial court also acknowledged that any harm would be mitigated by the foster family's commitment to maintaining contact with Jacob. The trial court then placed little weight on the fourth factor because of Shawn's young age, but in relation to the fifth factor, the trial court found that Shawn had spent the majority of his life outside of the parental home. Overall, the trial court emphasized the sixth factor here, saying that termination of Jacob's parental rights would provide Shawn with the stability and permanency he needed. From this record, this court discerns no erroneous exercise of discretion.

Indeed, as Jacob acknowledges, "[a]s required by WIS. STAT. § 48.426, the court weighed the required factors."

¶38 Rather, as the State and the GAL argue, Jacob's argument amounts to a disagreement regarding the trial court's exercise of discretion and the weight assigned to the factors and testimony given at the disposition hearing, and Jacob admits as much when he argues that "[Jacob] believes that the court's weighing was erroneous given the outcome and decision to terminate his parental rights." This court will not overturn a discretionary decision of the trial court based on a disagreement with the weight the trial court assigned to each factor or the testimony given. "A determination of the best interests of the child in a termination proceeding depends on first-hand observation and experience with the persons involved and therefore is committed to the sound discretion of the circuit court." *See David S. v. Laura S.*, 179 Wis. 2d 114, 150, 507 N.W.2d 94 (1993).

¶39 Furthermore, as with his first argument, Jacob's argument here is based solely on his own favorable testimony given at the disposition hearing, and he ignores the remainder of the testimony provided by the foster mother and the case manager that conflicts with his own favorable testimony. He argues that based on "this record"—referring to only his own testimony—"there is no support" for the trial court's decision to terminate Jacob's parental rights.

¶40 At the disposition hearing, the trial court heard the additional testimony from the foster mother that Shawn was thriving in her home, that she was an adoptive resource, and that she was committed to maintaining a relationship with Jacob. The trial court also heard testimony from the case manager that Jacob was still struggling to meet the conditions for Shawn's return, and more specifically, there were ongoing concerns regarding Jacob's anger and

the safety of the home that Jacob was able to provide. Jacob fails to recognize any of this testimony in making his argument, and therefore, this court rejects his argument that the trial court erroneously exercised its discretion in terminating his parental rights, as the argument fails to recognize any of the testimony in the record that does support the trial court's discretionary decision.

¶41    Furthermore, Jacob asserts that the trial court placed "excessive emphasis" on events predating Shawn's birth and attributed Lauren's failures to Jacob. This argument misconstrues the trial court's reasoning provided at the disposition hearing. Rather than attribute Lauren's failures to Jacob, the trial court found that Jacob failed to protect Shawn from Lauren's drug abuse by continuing his relationship with her and leaving Shawn in her care. The trial court was concerned about Jacob's decision to continue a relationship with Lauren and Jacob's failure to recognize the signs of Lauren's drug abuse, the dangers that it presented in the home, and Jacob's seeming indifference to exposing Shawn to this environment.[10]   Thus, it was not Lauren's failures that were assigned to Jacob. Instead, it was Jacob's failures in allowing Lauren in his home and exposing Shawn to drug abuse, and failing to fulfill his protective role as a parent.

---

[10] In fact, as to Jacob's failure to recognize signs of Lauren's drug abuse, the trial court found that Jacob was unaware that Lauren was using drugs during her pregnancy with Shawn. Additionally, when Lauren was hospitalized during her pregnancy, she slipped out of the hospital to obtain cocaine, and Jacob was similarly unaware that Lauren left the hospital. Furthermore, there was testimony by a case manager at the grounds trial in regards to a discussion she had with Jacob about Lauren's substance abuse where Jacob indicated that he did not know where Lauren was obtaining drugs because he was home with her.

## CONCLUSION

¶42    In sum, this court rejects Jacob's arguments that there was insufficient evidence at the grounds trial to support the jury's verdicts and that the trial court erroneously exercised its discretion at the disposition hearing.  In only providing his own favorable testimony to support his arguments, Jacob ignores the extensive testimony provided by the case managers and others throughout these proceedings.  Moreover, because this testimony as a whole often contradicted Jacob's own testimony, Jacob failed to provide a full picture of the testimony introduced at the grounds trial and the disposition hearing, and Jacob has provided a misleading picture of the evidence introduced over the course of these proceedings.  Thus, this court concludes that the evidence was sufficient to support the jury's verdicts rendered at the grounds trial and concludes that the trial court did not erroneously exercise its discretion at the disposition hearing when it terminated Jacob's parental rights.  Consequently, the order of the trial court is affirmed.

*By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.